# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WENDELL PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-6633 |
| | ) | |
| QUALITY TERMINAL SERVICES, LLC, | ) | Judge Robert M. Dow, Jr. |
| d/b/a Quality Terminal Services, Inc., a | ) | |
| Colorado limited liability company, | ) | |
| BURLINGTON NORTHERN SANTA FE | ) | |
| CORPORATION, a Delaware corporation, | ) | |
| PSYCHEMEDICS CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Wendell Phillips ("Phillips"), filed a seven-count amended complaint [25] against Defendants Quality Terminal Services, LLC ("QTS"), BNSF Railway Company ("BNSF")[1], and Psychemedics Corporation ("Psychemedics") on March 27, 2009. All of Plaintiffs claims arise out of a 2008 drug test which resulted in the termination of Plaintiff's employment with QTS. Before the Court is Defendant BNSF's motion to dismiss [30] all claims against it – which consist of various state law tort claims – pursuant to Fed. R. Civ. P. 12(b)(6). The Court has jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. For the reasons stated below, the motion [30] is granted in part and denied in part.

---

[1] As BNSF notes in its motion to dismiss, it was improperly sued as Burlington Northern Santa Fe Railway Company.

## I. Background[2]

Plaintiff resides in Bellwood, Illinois. Compl. ¶ 1. In May 2000, Plaintiff was hired by QTS, a Colorado limited liability company that provides transportation, freight and railroad services throughout parts of the United States, to work at QTS's intermodal facility operations located in Cicero, Illinois ("the Cicero facility"). *Id*. ¶ 8. Plaintiff worked as a spotter, hostler driver, hitch inspector and securement verifier at QTS. *Id*. ¶¶ 8-9. During his employment with QTS, Plaintiff was a member of Union Local 705, which had a collective bargaining agreement with QTS. *Id*. ¶¶ 92, 94. QTS conducted at least six random drug tests on Plaintiff during his employment, all of which returned negative results. *Id*. ¶ 11.

In the spring of 2008, Plaintiff learned that BNSF, a rail carrier operating throughout parts of the United States, would be taking over QTS's operations at the Cicero facility in 2009. *Id*. ¶ 12. BNSF, which was aware of the collective bargaining agreement between QTS and Union Local 705 (*id*. ¶ 96), invited QTS employees to apply with BNSF to fill the positions that were to be vacated by QTS in 2009. *Id*. ¶ 13. On June 25, 2008, Plaintiff applied to be an intermodal equipment operator with BNSF. *Id*. ¶ 14. At BNSF, an intermodal equipment operator acts as a hostler driver, hitch inspector and/or securement verifier. *Id*.

On July 23, 2008, Plaintiff attended an orientation held by BNSF in Countryside, Illinois. *Id*. ¶ 15. At the orientation, BNSF informed the applicants that they would be required to submit to a pre-employment drug test. *Id*. ¶ 16. Plaintiff agreed to submit to the drug test, and, during the July 23 orientation, BNSF (or an agent acting on its behalf) cut a length of hair from Plaintiff's chest for drug testing. *Id*. ¶ 17. BNSF claims that Plaintiff's hair sample was sent to a

---

[2] For purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See, e.g., *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Therefore, the Court also will consider the exhibits to Plaintiff's complaint.

laboratory at Psychemedics, a biotechnology company located in Culver City, California that provides drug testing services for businesses. *Id*. ¶ 18.

On August 15, 2008, Plaintiff received a letter from BNSF extending to him a conditional offer of employment to join BNSF as an intermodal equipment operator at the Cicero facility. *Id*. ¶ 19. The August 15 letter stated that the offer was "contingent on the favorable outcome of a pre-employment background screening," including a "hair analysis drug screen." *Id*. at Ex. A. On August 29, 2008, Plaintiff received an e-mail from a company called Comprehensive Health Services, Inc. with the subject line "BNSF Applicant Notification philips, wendell." *Id*. ¶ 20, Ex. B. The e-mail stated: "You recently applied to BNSF for the position of Crane Director. You failed a test provided by another vendor – EMSI." *Id*. ¶ 20, Ex. B.

At or about the same time, Plaintiff received a phone call from Dr. Joseph Thomasino, who informed Plaintiff that his pre-employment drug test results were positive. *Id*. ¶ 21. During his phone call with Dr. Thomasino, Plaintiff insisted that there was a mistake or the results were wrong because he did not use cocaine. *Id*. ¶ 22. Plaintiff further requested that either a second test be performed on the remaining hair sample, or that the remaining hair be sent to him so that he could have a second test performed. *Id*. However, Dr. Thomasino denied this request. *Id*. Additionally, Plaintiff requested that Dr. Thomasino provide him with a copy of the test results. *Id*. ¶ 23. Dr. Thomasino instructed Plaintiff to put his request in writing and fax it to Dr. Thomasino. *Id*. ¶ 24. Plaintiff did as instructed but has not yet been provided with a copy of his test results. *Id.* ¶ 25.

On September 2, 2008, Plaintiff went to Advanced Occupational Medicine Specialists in Bellwood, Illinois, a local drug screening facility, to have another hair sample taken for drug testing purposes. *Id.* ¶¶ 26-27. Advanced Occupational Medicine Specialists sent the chest hair

3

sample taken from Plaintiff to Quest Diagnostics in Atlanta, Georgia, for testing. *Id.* ¶ 27. On September 5, 2008, Quest Diagnostics performed a drug test on the hair sample, and reported that the results were negative. *Id.* ¶ 28.

At some time prior to September 5, 2008, BNSF informed QTS of Plaintiff's positive pre-employment drug test result and/or provided it with a copy of the test results. *Id.* ¶ 29. BNSF also instructed QTS to forbid Plaintiff from entering the Cicero facility or returning to work. *Id.* On September 5, 2008, QTS informed Plaintiff by hand delivered letter that he was restricted from the property because of the pre-employment drug test results. *Id.* ¶ 30. The letter also stated that BNSF would lift the restriction if Plaintiff completed a company-sponsored substance abuse program. *Id.* In response, Plaintiff offered the results of the drug test done by Quest Diagnostics, and requested that he be given another opportunity to retake the drug screening test. *Id.* ¶ 31.

Around this time, Plaintiff called a BNSF representative and informed him that the pre-employment test results were incorrect, and that Plaintiff had another drug test performed by Quest Diagnostics, which produced a negative result. *Id.* ¶ 32. Plaintiff also requested that the remaining hair sample from the Psychemedics' drug test be retested. *Id.* The representative informed Plaintiff that his remaining hair sample had been destroyed and was not available for retesting. *Id.* ¶ 33. Both QTS and BNSF refused to consider the results from the test performed by Quest Diagnostics, refused to retest Plaintiff, and either refused to retest the remaining hair sample to confirm the original test results, or destroyed the remaining hair sample. *Id.* ¶ 34. QTS again offered to remove the restriction if Plaintiff completed a substance abuse program. *Id.* ¶ 35.

Plaintiff agreed to participate in the substance abuse program. *Id*. ¶ 36. At the first meeting, Plaintiff showed the results of the Quest Diagnostics drug test to a QTS representative or the program moderator. *Id.* The QTS representative told Plaintiff that unless he admitted to having a drug problem and agreed that the Psychemedics' test results were accurate, he would not be allowed to complete the substance abuse program, he would never work for QTS again, he would never get a job with BNSF, and he would never work in the railroad industry again. *Id*. ¶ 37. Plaintiff refused to state that he used cocaine or that the Psychemedics' test results were valid. *Id*. ¶ 38. Plaintiff lost his job with QTS. *Id.*

Plaintiff asserts various state law tort claims against BNSF based on its involvement in the drug testing and the subsequent termination of his employment with QTS, including a negligence claim (Count IV), a defamation claim (Count V), and a tortious interference with contractual relations claim (Count VI). Plaintiff also seeks to hold BNSF liable for the allegedly negligent acts of Psychemedics (Count II).

## II. Legal Standard on a Rule 12(b)(6) Motion

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true.

*E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true, * * * 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. The Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

**III.    Analysis**

   **A.    Negligence Claims**

Counts II and IV of the first amended complaint purport to state negligence claims against Psychemedics and BNSF. To state a claim for negligence, Plaintiff must allege that BNSF owed a duty of care to Plaintiff, BNSF breached that duty, and that breach proximately caused the Plaintiff damage. See *Iseberg v. Gross*, 227 Ill.2d 78, 86-87, 879 N.E.2d 278, 284 (Ill. 2007). Each of Plaintiff's negligence claims is predicated, at least in part, on federal regulations promulgated under the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq*. Therefore, a brief overview of the FRSA and the cited regulations is necessary.

Congress enacted the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary of Transportation is authorized to promulgate and issue regulations and orders for

every area of railroad safety. 49 U.S.C. § 20103(a); see also *Burlington Northern and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 794 (7th Cir. 1999). The Secretary regulates rail safety through the Federal Railroad Administration ("FRA"). *Doyle*, 186 F.3d at 794. The FRA has promulgated numerous regulations pertaining to railroad safety, including regulations regarding drug and alcohol testing of transportation employees. See 49 C.F.R. § 219.501 (requiring pre-employment drug testing of certain transportation employees); 49 C.F.R. § 40.1 *et seq.* (setting forth procedures for transportation workplace drug and alcohol testing programs).

The regulations require that, before "perform[ing] covered service for a railroad," "covered employee[s] * * * undergo testing for drugs." 49 C.F.R. § 219.501. Under the regulations, a "covered employee" is "a person who has been assigned to perform service in the United States subject to the hours of service laws (49 U.S.C. ch. 211)," which includes train employees (49 U.S.C. § 22103), signal employees (49 U.S.C. § 21104), and dispatching service employees (49 U.S.C. § 22105). Plaintiff alleges, and BNSF concedes, that BNSF is a rail carrier as defined by 49 U.S.C. § 20102, and consequently is subject to the safety and drug testing regulations promulgated by the FRA.

### 1. Count II – BNSF's Alleged Liability for Psychemedics' Negligence

Count II, while nominally a negligence claim against Psychemedics based on its alleged failure to properly and accurately perform and report the results of Plaintiff's drug test, also seeks to hold BNSF liable for Psychemedics' alleged negligence. Plaintiff alleges that Psychemedics is an expert in the field of drug testing and, as such, owes a "duty to properly and accurately perform and report the results of its drug tests." Cmplt. ¶ 55. Illinois case law recognizes that a "drug-testing laboratory owes a duty of reasonable care to persons whose specimens it tests for employers or prospective employers." *Stinson v. Physicians Immediate*

7

*Care, Ltd.*, 646 N.E.2d 930, 934 (Ill. App. 2d Dist. 1995); see also *Palonis v. Jewel Food Stores, Inc.*, 383 F. Supp. 2d 1072, 1074 (N.D. Ill. 2005). Plaintiff further alleges that he never used cocaine, and therefore Psychemedics breached this duty by reporting that Plaintiff failed the drug test. Finally, Plaintiff alleges that he was injured as a result of the breach. Thus, Plaintiff has stated a legally cognizable negligence claim against Psychemedics.

The question with respect to BNSF's motion to dismiss is whether BNSF can be held vicariously liable for Psychemedics' alleged negligence. Illinois law provides that the negligence of one person will be imputed to another only where a master/servant, principal/agent or employer/employee relationship exists. See *Moy v. County of Cook*, 640 N.E.2d 926, 928 (Ill. 1994) ("[T]o impute the negligence of one person to another, such persons must stand in a relation of privity and there is no such thing as imputable negligence except in those cases where such a privity as master and servant or principal and agent exists") (quoting *Palmer v. Miller*, 43 N.E.2d 973 (Ill. 1942)); *Alms v. Baum*, 796 N.E.2d 1123, 1129 (Ill. App. Ct. 1st Dist. 2003) (same). Here, the parties dispute whether Psychemedics acted as BNSF's agent or as an independent contractor. If Psychemedics was BNSF's agent, BNSF "is liable for the acts of [Psychemedics] performed within the scope of the agency." *Gomien v. Wear-Ever Aluminum, Inc.*, 276 N.E.2d 336 (Ill. 1971). By contrast, if Psychemedics is an independent contractor, BNSF "will not be held vicariously liable for [its] tortious acts or omissions" unless BNSF retained "control over the operative details of [Psychemedics'] work." *Madden v. Paschen*, 2009 WL 3161787, at *14 (Ill. App. Ct. 1st Dist. Sept. 30, 2009); see also *Aguirre v. Turner Const. Co.*, 582 F.3d 808, 815 (7th Cir. 2009) (noting that under Illinois law, "no liability will be imposed on the employer or general contractor unless the evidence shows the employer or

general contractor retained control over the 'incidental aspects' of the independent contractor's work") (citation omitted).

"The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Tech., Inc.,* 148 F.3d 742, 745 (7th Cir. 1998) (citing cases). Although there is no rigid rule for determining whether an agency or an independent contractor relationship exists, the four major factors to consider are: (1) the right to control the manner in which work is performed; (2) the method of payment and whether taxes are deducted; (3) the level of skill required to perform the work; and (4) furnishing of necessary tools, materials and equipment. *Lang v. Silva,* 715 N.E.2d 708, 716 (Ill. App. Ct. 1st Dist. 1999). The right to control the manner in which work is performed is considered the "hallmark of agency." *Kaporovskiy v. Grecian Delight Foods, Inc.,* 787 N.E.2d 268, 272 (Ill. App. Ct. 1st Dist. 2003). Conversely, an independent contractor undertakes to produce a certain result, but is not controlled in regard to how that result is achieved. *Lang,* 715 N.E.2d at 716. "The existence and scope of an agency relationship are questions of fact." *Tribett v. BNC Mortgage, Inc. et al.*, 2008 WL 162755, at *4 (N.D. Ill. Jan. 17, 2008).

Under the federal pleading standard, Plaintiff is not required to plead facts which would establish agency. See *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 670 (N.D. Ill. 2005). Rather, to plead the existence of an agency relationship, a plaintiff must allege some factual predicate to create the inference of agency. *Tribett*, 2008 WL 162755, at *4.

Plaintiff does not expressly plead the existence of an agency relationship between Psychemedics and BNSF in his complaint. The complaint also contains no facts from which the Court can reasonably infer the existence of such a relationship. In support of his theory that

BNSF is liable for Psychemedics' alleged negligence, Plaintiff alleges that, under the FRA regulations regarding drug testing of transportation employees, BNSF "is responsible for meeting all applicable procedures and requirements of workplace drug testing and is responsible for the actions of its officials, representatives, and agents in carrying out the requirements of the DOT agency regulations." Cmplt. ¶ 59. Plaintiff further alleges that Psychemedics performed the drug test at issue, and that BNSF "chose to rely upon and authorize Psychemedics to perform drug tests." *Id.* ¶ 60. These allegations do not give rise to an inference that BNSF exercised any degree of control over the manner in which Psychemedics performed the drug test. Therefore, Count II is dismissed as to BNSF for failure to state a claim.

As noted above, Plaintiff alleges that BNSF is liable for Psychemedics' alleged negligence by virtue of the DOT drug testing regulations. Even assuming that the regulations subject BNSF to liability for Psychemedics' conduct, that fact does not establish that Psychemedics is BNSF's agent for purposes of Illinois tort law. Moreover, to the extent that Plaintiff is arguing that the regulations imposed a duty on BNSF to ensure that Psychemedics complied with the regulations, as discussed below, Plaintiff cannot show that the regulations impose such a duty.

### 2. Count IV – Negligence by BNSF

The negligence claim set forth in Count IV is based on the federal regulations discussed above. According to Plaintiff, the drug testing regulations promulgated by the FRA impose various duties on employers, including BNSF.[3] Plaintiff further alleges that BNSF breached

---

[3] Specifically, Plaintiff alleges that BNSF had a duty under 49 C.F.R. § 219.701 to ensure that the testing standards utilized satisfy the standards prescribed by 49 C.F.R. § 40.1 *et seq.* Plaintiff further alleges that BNSF had a duty not to release the results of drug tests to third parties (citing 49 C.F.R. § 40.321), and to notify Plaintiff of his right to test the split specimen and to cancel the results of the drug test when the split sample was not available and the test sample was improperly destroyed (citing 49 C.F.R. §§ 40.153, 40.187(d), 40.201(e)).

those duties by, *inter alia*, failing to ensure that the testing standards utilized satisfied the standards prescribed by 49 C.F.R. § 40.1 *et seq.*, failing to ensure that the results of drug test were not released to third parties, failing to notify Plaintiff of his right to test the split specimen, and failing to cancel the results of the drug test when the split sample was not available and the test sample was improperly destroyed.

BNSF contends that the regulations at issue do not impose any duties on it with respect to Plaintiff because the position for which Plaintiff was applying – that of intermodal equipment operator – is not subject to 49 C.F.R. § 40.1 *et seq.* As discussed above, the regulations govern the drug testing of "covered employees" – meaning train employees (49 U.S.C. § 22103), signal employees (49 U.S.C. § 21104), and dispatching service employees. According to BNSF, intermodal equipment operators perform tasks related to the loading of trailers and containers on or off chassis and railcars in the railyard, and cannot be considered train employees, signal employees, or dispatching service employees. Plaintiff alleges that an intermodal equipment operator is equivalent to a hostler driver (Cmplt. ¶ 14); that a hostler is a covered employee under the regulations (*id.* ¶ 10); and that as a hostler driver for QTS he was considered and treated as a covered employee (*id.* ¶ 11). Taking these allegations as true, as it must at this stage, the Court finds that Plaintiff has sufficiently alleged that he was applying for a job as a "covered employee" within the meaning of the regulations, such that the requirements set forth in 49 C.F.R. § 40.1 *et seq.* apply.

BNSF further argues that, even if the regulations do apply to Plaintiff, his negligence claim must fail because there is no private cause of action against a railroad based on noncompliance with the requirements of 49 C.F.R. § 40.1 *et seq.* In support of this position, BNSF cites 49 C.F.R. § 219.17(b), which provides: "Nothing in this part * * * [c]reates a private

right of action on the part of any person for enforcement of the provisions of this part or for damages resulting from noncompliance with this part."

While BNSF is correct that 49 C.F.R. § 219.17(b) establishes that no private right of action exists under the regulations, the inquiry does not end there. Under Illinois law, the violation of a regulation, ordinance, or statute designed to protect human life or property is *prima facie* evidence of negligence, meaning it is evidence that can be rebutted by proof that the person acted reasonably under the circumstances. See *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 506 (7th Cir. 2009) ("In a common law negligence action, a violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence; the violation does not constitute negligence *per se*.") (quoting *Abbasi ex rel. Abbasi v. Paraskevoulakos,* 718 N.E.2d 181, 185 (Ill. 1999)). In other words, "if a statute defines what is due care in some activity, the violation of the statute * * * presumptively establishes that the violator failed to exercise due care." *Cuyler v. U.S.*, 362 F.3d 949, 952 (7th Cir. 2004) (citation omitted). Here, Plaintiff contends that 49 C.F.R. § 40.1 *et seq.* defined BNSF's duty of care.

But, as the Seventh Circuit explained in *Cuyler*, "the statutory definition [of the standard of care] does not come into play unless the tort plaintiff establishes that the defendant owes a duty of care to the person he injured * * *, because tort liability depends on the violation of a duty of care to the person injured by the defendant's wrongful conduct." *Id.* (citations omitted). Put differently, the existence of a duty and the breach of a duty are distinct concepts. See *Grant v. South Roxana Dad's Club*, 886 N.E.2d 543, 551 (Ill. App. Ct. 5th Dist. 2008) ("The existence of a duty does not equate to a breach of duty. The two concepts are distinct and must be considered separately."). Consequently, the violation of a regulation is evidence of a breach only if an underlying duty exists. And "the mere fact that a statute *defines* due care does not in and of

itself create a duty enforceable by tort law." *Cuyler*, 362 F.3d at 952. See also *Recio v. GR-MHA Corp.*, 851 N.E. 2d 106, 115 (Ill. 2006) ("where a statute or ordinance did not create a private right of action, its violation would only be relevant to whether the defendant 'had acted with less than reasonable care' [but i]t would not have the effect of creating a duty to [the plaintiff] where none existed"); *Ross v. Dae Julie, Inc.*, 793 N.E.2d 68, 75 (Ill. App. Ct. 1st Dist. 2003) ("While alleged violations of codes which do not contain language creating a statutory duty may be evidence of failure to exercise reasonable care, the violations do not create a duty where none otherwise exists. * * * Accordingly, the alleged violations of these safety regulations and standards cannot create a duty.").

Here, Plaintiff's negligence claim is premised on duties that he claims the federal drug testing regulations impose on BNSF. However, as the cases above illustrate, those regulations cannot impose any duties on BNSF that did not exist at common law. This Court is aware of no common law duty imposed on employers with respect to drug tests performed by third party laboratories, and Plaintiff has not identified any applicable common law duties. Because Plaintiff has failed to allege that BNSF owed him a duty, BNSF's motion to dismiss is granted as to Count IV.

### B. Count V – Defamation

In Count V, Plaintiff brings a defamation claim against BNSF. To state a claim for defamation under Illinois law, a plaintiff must allege that the defendant made a false statement about the plaintiff, that there was an unprivileged publication of the statement to a third party, and that the publication damaged the plaintiff. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006). Here, Plaintiff alleges that BNSF made a false statement to a third party when it

13

informed QTS that Plaintiff had failed the pre-employment drug test. Plaintiff also alleges that he suffered damages because he lost his job as a result of the communication.

BNSF responds that Plaintiff cannot establish the false statement element of a defamation claim because Plaintiff did in fact fail the drug test, such that any statement to that effect was not false. "[T]rue statements cannot support a claim for defamation" because "[t]ruth is an absolute defense to defamation." *Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 1st Dist. 2008). A defendant needs only to show the "substantial truth" of the alleged statement to establish this defense. *J. Maki Const. Co. v. Chicago Regional Council of Carpenters*, 882 N.E.2d 1173 (Ill. App. Ct. 2d Dist. 2008). Substantial truth is demonstrated when the defendant has shown that the "gist" or "sting" of the alleged defamatory statement is true. *Id*. "While determining 'substantial truth' is normally a question for the jury, the question is one of law where no reasonable jury could find that substantial truth had not been established." *Id*.

In support of its claim that Plaintiff failed the drug test, such that any statement to that effect was not false, BNSF points to two exhibits attached to Plaintiff's Amended Complaint; namely, the email Plaintiff received advising him that he failed the drug test, and the letter Plaintiff received from QTS stating that BNSF had reported that Plaintiff failed the drug test. According to BNSF, these documents establish that Plaintiff did in fact fail the drug screen. "A cause of action can be dismissed if a plaintiff more or less concedes the essential truth of the allegedly defamatory statement or if there is no basis for a reasonable jury to find that the plaintiff's defamatory statement was not substantially true even as framed in plaintiff's own allegations." *Medallion Products, Inc. v. H.C.T.V., Inc.*, 2007 WL 1022010, at *3 (N.D. Ill. March 29, 2007) (citing *Clark v. Maurer*, 824 F.2d 565, 566 (7th Cir. 1987)). But here Plaintiff alleges that the results of the drug test were incorrect and that BNSF's statement was false. At

14

this early stage, the Court finds no basis to conclude that a reasonable jury could not find that the reported drug results were wrong and that BNSF's statement to QTS was false. For these reasons, BNSF's motion to dismiss is denied as to Count V.[4]

### C. Count VI – Tortious Interference with Contractual Relations

Count VI alleges a tortious interference with contractual relations claim against BNSF. To state claim for tortious interference with contractual relations, Plaintiff must allege that a valid and enforceable contract existed, that BNSF was aware of the contract, that BNSF intentionally and unjustifiably induced a breach of the contract, and that Plaintiff suffered damages as a result. See *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005).

Here, Plaintiff bases his tortious interference with contractual relations claim on the collective bargaining agreement between QTS and Local Union 705, which he alleges constituted a valid and enforceable contract regulating his employment relationship with QTS. Additionally, Plaintiff alleges that BNSF was aware of this employment relationship and the collective bargaining agreement, that BNSF induced a breach of this contractual relationship when it barred Plaintiff from entering the Cicero facility, and that, as a result of these actions,

---

[4] Plaintiff also alleges that the communication at issue accused him of criminal activity, Cmplt. ¶ 88, arguing that the possession and use of cocaine is a criminal offense. In Illinois, defamatory statements imputing the commission of a criminal offense give rise to a defamation *per se* cause of action, meaning actual damages to the plaintiff's reputation are presumed. *Walker v. Braes Feed Ingredients, Inc.*, 2003 WL 1956162, at *2 (N.D. Ill. April 23, 2003). Here, Plaintiff also pleads damage to his reputation. Cmplt. ¶ 88. Therefore, Plaintiff appears to be alleging claims for defamation *per se* and defamation *per quod*. BNSF raises an innocent construction defense under *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296 (Ill. 1996). Under the innocent construction doctrine, which "applies only to actions for defamation *per se*[,] * * * even if a statement fits within one of the recognized defamation *per se* categories, recovery is precluded if the statement reasonably can be given an innocent construction." *Anderson,* 667 N.E.2d at 1301-02. In order to determine whether a statement can be innocently construed, a court must consider the statement "in context, with the words and the implications therefrom given their natural and obvious meaning." *Id.* at 1302 (quoting *Chapski v. Copley Press,* 442 N.E.2d 195 (Ill. 1982)). Based on the complaint alone, the Court cannot evaluate the full context in which the statement at issue was made, and therefore cannot determine at this early stage whether the statement may reasonably be innocently interpreted. BNSF of course remains free to assert such a defense to Plaintiff's defamation *per se* claim at summary judgment when the record has been more fully developed.

15

Plaintiff was terminated by QTS, which in turn resulted in a loss of salary, advancement opportunities, and employee benefits.

BNSF moves to dismiss Count VI on multiple grounds. First, BNSF contends that Plaintiff was an at-will employee of QTS, and therefore, had no valid and enforceable employment contract with QTS on which to base a tortious interference with contractual relations claim. BNSF is correct that, under Illinois law, "[a]n action for tortious interference with contractual relations is not the proper vehicle for a discharged [at-will employee] seeking to recover damages." *Canel and Hale, Ltd. v. Tobin*, 710 N.E.2d 861, 871 (Ill. App. Ct. 1st Dist. 1999). Rather, an action for tortious interference with a contract that is terminable at will is classified as one for intentional interference with prospective economic advantage. See *id.*; *Storm & Associates, Ltd. v. Cuculich*, 700 N.E.2d 202, 210 (Ill. App. 1st Dist. 1998). However, to the extent that Plaintiff was an at-will employee (which he appears to concede[5]), the fact that Count VI of the complaint is captioned "Tortious Interference with Contractual Relations" is not fatal to Plaintiff's tortious interference claim. See *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) (stating that a complaint is not required to set out a legal theory, and that "[h]aving specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint"); *Williams v. Seniff*, 342 F.3d 774, 792 (7th Cir. 2003) ("the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal"); *Evers v. Astrue*, 536 F.3d 651, 658 (7th Cir. 2008) ("the characterization or labeling of claims by the pleader is not controlling"). Therefore, the Court will consider whether the complaint states a claim for tortious interference with a prospective economic advantage.

---

[5] Plaintiff states in his response that "technically speaking, BNSF may be correct" that he was an at-will employee. [40, at 10].

The elements of such a claim are: (1) Plaintiff's reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 568 N.E.2d 870 (Ill. 1991). With respect to the third element, "a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but * * * [that] the defendant has committed some impropriety in doing so." *Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 768 (Ill. App. Ct. 1st Dist. 2004).

Here, Plaintiff has alleged facts that he had an existing employment relationship with QTS and a reasonable expectation of continued employment. "Until terminated, [a] relationship created by a contract terminable at will is subsisting and will presumptively continue in effect so long as the parties are satisfied." *Id.* Consequently, "[s]uch a relationship is sufficient to support an action for tortious interference." *Id.* Plaintiff also alleges the following: (1) that BNSF was aware of the employment relationship, (2) that BNSF prohibited Plaintiff from entering the Cicero facility despite knowing that doing would cause QTS to fire Plaintiff, and (3) that QTS in fact fired Plaintiff because he was barred from entering the Cicero facility.

BNSF contends that Plaintiff cannot allege the third element of a tortious interference claim – interference by defendant – because BNSF simply restricted Plaintiff from entering the Cicero facility until he successfully completed a company sponsored substance abuse program. The Court disagrees; prohibiting Plaintiff from entering his place of employment is sufficient interference with Plaintiff's employment relationship. BNSF's argument regarding the fourth element of a tortious interference claim – damages to the plaintiff resulting from defendant's

interference – is likewise unavailing. According to BNSF, its action did not result in Plaintiff's termination; rather, Plaintiff was terminated for refusing to participate in a QTS substance abuse program. The Complaint alleges that Plaintiff was terminated after refusing to admit to drug use as part of the substance abuse program (Cmplt. ¶ 38) and that he was terminated because he was unable to enter the Cicero facility (*id.* ¶ 102). Taking all the allegations as true, the Court finds that Plaintiff has sufficiently stated a claim for tortious interference with a prospective economic advantage, including alleging that he was damaged as a result of BNSF's actions.

Finally, BNSF contends that its conduct was privileged because it was acting pursuant to its business interest in having a drug free workplace, and therefore Plaintiff must establish that BNSF's actions were unjustified or were done with actual malice. A defendant's interference is privileged where "the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *HPI Health Care v. Mount Vernon Hospital,* 545 N.E.2d 672, 677 (Ill. 1989). Where a defendant's interference is privileged, the plaintiff bears the burden of pleading and proving that the defendant's conduct was unjustified or malicious. *Id.* "In the context of a suit for tortious interference with a prospective economic relationship, the term 'malicious' does not carry the ordinary meaning of vindictive or malevolent; it means intentionally and without justification." *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171 (7th Cir. 1993).

The federal notice pleading standard, not Illinois's fact pleading requirement, applies to Plaintiff's tortious interference claim. See *Hefferman v. Bass*, 467 F.3d 596, 599 (7th Cir. 2006) ("The Federal Rules of Civil Procedure apply to all cases filed in federal court, no matter what the basis of subject matter jurisdiction."). Under Rule 8 and the federal regime, "[n]otice is what counts. Not facts; not elements of 'causes of action'; not legal theories." *Id.* at 600. Although

the complaint does not use specifically the words "malicious" or "unjustified," it alleges facts that, if proven, could show that BNSF's conduct was unjustified. In particular, Plaintiff alleges that he told a BNSF representative that the drug test results were incorrect, and informed BNSF about the negative result of the September 5th drug test performed by Quest, but that BNSF nevertheless refused to allow him to access the Cicero facility without undergoing a substance abuse program. For these reasons, the Court finds that Plaintiff has stated a claim for tortious interference with a prospective economic advantage.

However, the Court concludes that Plaintiff has failed to state a contractual relations claim. As noted above, Plaintiff appears to concede that he was an at will employee, which would foreclose such a claim. Even assuming Plaintiff is not an at will employee, any tortious interference with contractual relations claim based on the collective bargaining agreement would be preempted by the Labor Management Relations Act ("LMRA"). See *Kimbro v. Pepsico, Inc.,* 215 F.3d 723, 727 (7th Cir. 2000) (holding that a suit by an employee against his employer alleging tortious interference with a collective bargaining agreement is preempted by the LMRA because interpretation of the contract is necessary to resolution of the dispute). Therefore, BNSF's motion to dismiss Count VI is granted as to the contractual relations claim and denied as to the prospective business interest claim.

## V. Conclusion

For the reasons stated above, BNSF's motion to dismiss [30] is granted with respect to Count II, Count IV, and the tortious interference with contractual relations claim in Count VI. BNSF's motion to dismiss is denied as to Count V and the tortious interference with a prospective business interest claim set forth in Count VI.

Dated: December 4, 2009

                                                            _____
Robert M. Dow, Jr.
United States District Judge