**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WENDELL PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 08-cv-6633 |
| | ) | |
| QUALITY TERMINAL SERVICES, LLC, | ) | Judge Robert M. Dow, Jr. |
| d/b/a Quality Terminal Services, Inc., a | ) | |
| Colorado limited liability company, | ) | |
| BURLINGTON NORTHERN SANTA FE | ) | |
| RAILWAY COMPANY, a Delaware corporation, | ) | |
| and PSYCHEMEDICS CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wendell Phillips ("Plaintiff") filed a seven-count amended complaint [25] against Defendants Quality Terminal Services, LLC ("QTS"), BNSF Railway Company ("BNSF")[1], and Psychemedics Corporation ("Psychemedics") on March 27, 2009. The Court has jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. All of Plaintiff's claims arise out of a 2008 drug test, which resulted in Plaintiff being barred from a BNSF facility operated by QTS and effectively ended Plaintiff's employment with QTS. The Court granted BNSF's motion to dismiss as to some of the counts, but Plaintiff's claims against BNSF for defamation (Count V) and tortious interference with a prospective economic advantage (Count VI) survived. Plaintiff also brought the following claims against QTS, all of which remain pending: violation of due process pursuant to 42 U.S.C. § 1983 (Count I); QTS's liability for the negligence of Psychemedics (Count II); negligence by QTS (Count III); and intentional or reckless infliction of emotional distress (Count VII).

---

[1] BNSF was improperly sued as Burlington Northern Santa Fe Railway Company.

Defendant BNSF has moved for summary judgment [133] on all remaining claims, and Defendant QTS also has moved, in two separate motions [127 & 132], for summary judgment on all claims asserted against it. Defendant BNSF also moved to strike [152] Plaintiff's response to BNSF's Local Rule 56.1 statement of facts for failure to comply with Local Rule 56.1. For the reasons stated below, the Court grants BNSF's motion to strike [152] but allows Plaintiff to submit amended responses (already on file) to BNSF's statements of fact consistent with the Court's discussion below. The Court also grants the summary judgment motions [127, 132, & 152] filed by BNSF and QTS.

## I.     Background

### A.     BNSF's Motion to Strike Plaintiff's Local Rule 56.1 Statement of Facts

Plaintiff filed a Local Rule 56.1(b) Statement of Material Facts in Opposition to BNSF's Motion for Summary Judgment, which included both supplemental facts and Plaintiff's response to BNSF's Local Rule 56.1(a) Statement of Material Facts ("the Response to BNSF's SOF"). In the Response to BNSF's SOF, Plaintiff provided written objections or challenges to twenty-six of BNSF's statements. However, as pointed out by Defendant in its motion to strike, almost every one of Plaintiff's objections or challenges fails to either admit or deny the fact or to provide any citations to evidence that raises a genuine issue of material fact as to BNSF's statement. BNSF asks the Court to strike the Response to BNSF's SOF in its entirety. See *Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006) (affirming summary judgment where trial judge relied solely on defendant's statement of facts because plaintiff violated Local Rule 56.1); *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527–28 (7th Cir. 2000) (striking a statement of facts in its entirety because Local Rule 12(N), which is now Local Rule 56.1(b), was violated).

When analyzing Local Rule 56.1(b) statements, courts are not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon*, 233 F.3d at 529. Rather, fact statements are designed to "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Id.* at 527 (citation omitted). "Opinion, suggested inferences, legal arguments and conclusions are not the proper subject matter of a [Local Rule 56.1] statement. Including legal arguments in a [56.1] statement is wholly improper, redundant, unpersuasive and irksome; in short, it advances neither the interests of the parties nor of th[e] court." *Servin v. GATX Logistics, Inc.*, 187 F.R.D. 561, 562 (N.D. Ill. 1999) (citation omitted). *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (legal argument is improper within a Local Rule 56.1 statement of facts); *Judson Atkinson Candies Inc., v. Latini-Hoghberger*, 476 F. Supp. 2d 913, 922 (N.D. Ill. 2007) (legal argument is improper within a Local Rule 56.1 statement of facts). In response to Defendant's motion to strike, Plaintiff submitted his response to BNSF's motion to strike and a request that the Court allow him to file amended Local Rule 56.1(b)(3)(B) and (b)(3)(C) statements.

It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement. *Malec v. Sanford,* 191 F.R.D. at 583. In the present cases, both parties at times have offered legal conclusions in their statements of fact. Those conclusions will not be accepted by the Court as "facts." In addition, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. Thus, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on the summary judgment motions.

With these principles in mind, the Court grants Defendant's motion to strike, but allows Plaintiff to submit amended responses to Defendant's statements of fact, which will be considered by the Court in ruling on the motions for summary judgment. However, to the extent that Plaintiff attempts to introduce new, supplemental facts not previously raised in Plaintiff's original statement of facts, the Court will not consider those new facts in ruling on the motions for summary judgment. Plaintiff had all the facts available to him at the time that he filed his response to BNSF's motion for summary judgment. The Court will allow him to amend the technical defects in his responses—the glaring ones being his failure to admit or deny BNSF's statements and his failure to cite record evidence in support of certain denials—but the Court will not allow him to inject supplemental facts into the record after the motions have been fully briefed.

### B.     Facts

BNSF, a Delaware corporation with its corporate headquarters located in Fort Worth, Texas, is a rail carrier which operates throughout parts of the United States including in Cicero,

Illinois, where it owns an intermodal facility that was operated by QTS in 2008. Quality Terminal Services, LLC ("QTS"), a Colorado limited liability company with corporate headquarters located in Denver, Colorado, was contracted by BNSF to operate BNSF's intermodal facility in Cicero, Illinois, and did so through December 31, 2008. QTS provides, among other things, "lift services" to railroads at intermodal yards. Lift services consist of operating cranes or similar equipment to lift highway trailers or shipping containers on and off of railroad flatcars for long distance movement over railroads. The service includes driving the trailers and containers within the yard between the parking area and the tracks where they are loaded and unloaded. This driving operation is called "hostling."

In May 2000, Plaintiff Wendell Phillips was hired by QTS to work at QTS's intermodal facility operations located in Cicero, Illinois ("the Cicero facility"). Plaintiff worked as a spotter, hostler driver, hitch inspector, and securement verifier at QTS. During his employment with QTS, Plaintiff was a member of Union Local 705, which had a collective bargaining agreement with QTS. In the spring of 2008, Plaintiff learned that BNSF would be taking over QTS's operations at the Cicero facility in 2009.[2] BNSF, which was aware of the collective bargaining agreement between QTS and Union Local 705, invited the QTS employees to apply with BNSF for the positions that were going to be vacated by QTS in 2009. On June 25, 2008, Plaintiff applied to be an intermodal equipment operator with BNSF. At BNSF, an intermodal equipment operator acts as a hostler, driver, hitch inspector, and/or securement verifier.

On July 23, 2008, Plaintiff attended an orientation held by BNSF. At the orientation, BNSF informed the applicants that they would be required to submit to a pre-employment drug

---

[2]    QTS's services for BNSF at the Cicero facility were provided pursuant to an Intermodal Facility Services Agreement between QTS and BNSF dated March 1, 2006. On November 19, 2008, BNSF formally notified QTS that BNSF did not intend to renew the Agreement, which expired on December 31, 2008.

test. Plaintiff agreed to submit to the drug test, and, during the July 23 orientation, an agent of Examination Management Services, Inc. ("EMSI") took a hair sample from Plaintiff's head for drug testing. Phillips' donor number, used to identify his hair sample, was 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. Plaintiff's hair sample was sent to a laboratory at Psychemedics, a biotechnology company located in Culver City, California, that provides drug testing services for businesses.

On August 15, 2008, Plaintiff received a letter from BNSF extending to him a conditional offer of employment to join BNSF as an intermodal equipment operator at the Cicero facility. *Id*. ¶ 21. The August 15 letter stated that the offer was "contingent on the favorable outcome of a pre-employment background screening," including a "hair analysis drug screen."

Psychemedics received Plaintiff's hair sample on August 18, 2008. The "tamper-evident integrity seal on the collection pouch," which was initialed and dated by Phillips, and the seal on the Sample Acquisition Card were both intact when Psychemedics received Plaintiff's hair sample. Psychemedics performed the tests on Plaintiff's hair sample "in accordance with standard laboratory practices in compliance with the laboratory operating procedures and utilizing assay tests cleared by the US Food & Drug Administration specifically for hair drug testing." See BSNF's Ex. G, Phillips Laboratory Data Package, p. 1, Certification of Thomas Cairns. Psychemedics extensively washed Plaintiff's hair sample to ensure there was no contamination. Psychemedics verified, confirmed, checked, and retested Plaintiff's drug test and screening results. Psychemedics's testing involves two steps: an initial screen of a portion of the hair sample and a subsequent test of a second portion of the hair sample to confirm the presence of any substance detected in the initial screen, both of which were performed in this case.

According to the Psychemedics test analysis, Phillip's hair contained "the metabolite of Heroin, 6-MonoAcetylMorphine (6MAM) at 7.4 ng/10 mg hair." See BSNF Ex. G, Phillips

Laboratory Data Package, p. 3, ¶ 5, Summary of Procedures & Results. Psychemedics concluded that Phillips had ingested heroin, which was demonstrated by the presence of the metabolite of Heroin, 6-MonoAcetylMorphine above the cutoff in his hair sample. On August 22, 2008, Psychemedics notified BNSF that Plaintiff's drug test came back positive for heroin.

Psychemedics sent the test result to Dr. Joseph Thomasino, a medical review officer working on behalf of BSNF. A medical review officer reviews the results of toxicological tests, and, in those instances where the test comes back positive, checks to see if there are legitimate, alternative medical explanations for a positive test result. Dr. Thomasino testified that he followed his typical procedures in receiving the test results, contacting Plaintiff, investigating the test result, and sending the confirmations to BNSF. It is not within Dr. Thomasino's province to retest the sample; rather, his review centered on assessing the chain of custody for the sample and investigating whether a legitimate medical explanation existed for the positive test result.

According to Dr. Thomasino, medical review officer practice generally does not permit the results of prior tests or subsequent tests to be taken into account when evaluating the results of a drug test. According to Dr. Thomasino, "[t]here's no way to know that [a drug has] not simply cleared by the time of [a] second test," in cases where a second negative test follows an initial positive test. A negative subsequent drug test result means only that the person is "clear by the time of the second test" because "all things eventually clear with abstinence." Thomasino Dep. at 65:12 and 15–16; Freeman Dep. at pp. 56:16–57:9. The following factors affect whether an individual who tests positive on one drug test will test positive for the same drug on a subsequent test: time between tests, ingestion history, quantity used, frequency of use, potency of drug, body weight, and metabolism. Thomasino Dep. at 64:20–65:2. Hair testing can show use of cocaine and heroin up to ninety days prior to when the hair sample was taken. For

instance, if a person uses cocaine or opiates, the drug use might be detected on a hair test done three months after use but not on a subsequent hair test done three or four weeks after that. In many cases with hair samples, it is not possible to subsequently retest the original sample because the entire sample is used during the initial analysis. The hair sample for Plaintiff's subsequent drug test, which came back negative, was taken one month and ten days after the samples for BNSF's pre-employment tests.

On or about August 28, 2008, Plaintiff received a phone call from Dr. Thomasino, who informed Plaintiff that his pre-employment drug test results were positive for the presence of heroin. During his phone call with Dr. Thomasino, Plaintiff insisted that there was a mistake or the results were wrong because he had not used drugs in nearly 20 years. Plaintiff further requested that either a second test be performed on the remaining hair sample, or that the remaining hair be sent to him so that he could have a second test performed. Neither request was fulfilled by Thomasino, BSNF, or QTS.

On or around September 3, 2008, Phillips went to Advanced Occupational Medical Specialists, a local drug screening facility, to have another hair sample taken for drug testing purposes. The test came back negative for the presence of any drugs, including heroin. Phillips forwarded the test results to Pschemedics, which confirmed the results of the second test. As Plaintiff acknowledged in his response to BNSF's statement of facts, neither "BNSF's nor QTS's drug testing policies allow employees to submit a second sample or the results of a second drug test to appeal or challenge a positive test."

The Intermodal Facility Services Agreement between BNSF and QTS and Amendment Agreement 1 to the same, both of which governed the relationship between BNSF and QTS at the time of the events at issue in these cases, gave BNSF the right to restrict any QTS employees

from the Cicero facility if BNSF reasonably believed they posed a threat to the safety or security of BNSF's operations. BNSF believes, and Plaintiff does not dispute, that an individual working on the premises of one of BNSF's intermodal facilities who tests positive for illegal drugs poses a threat to the safety of BNSF's operations. After receiving Plaintiff's positive pre-employment drug test results, BNSF informed QTS that Plaintiff was barred from working at its Cicero facility until such time as he satisfactorily completed an employee assistance program for drug use. On September 5, 2008, Plaintiff came to the Cicero yard and was given a letter from QTS stating that he had been restricted from the property because BNSF reported to QTS that Plaintiff failed a pre-employment toxicological drug screen conducted by or on behalf of BNSF. Plaintiff's employment status was changed from "active" to "inactive."

While Plaintiff admits that there is no evidence that BNSF conveyed any information to QTS concerning the drug for which Plaintiff tested positive or any other details of the test, there is evidence that BNSF told QTS that Plaintiff was to be barred from the Cicero facility for failing a drug test. For instance, on or around August 28, 2008, Steven Klug, the Vice-President of Human Resources of BNSF, sent an e-mail to Michael Burke and a number of other BNSF co-workers, asking BNSF to limit its communication with QTS regarding the eight employees to the fact that these eight employees were only restricted from the Cicero yard as a result of information obtained from them in accordance with their employment applications to BNSF and not include the reason for this restriction—namely, the positive drug test results. However, the record reflects that, prior to sending the e-mail, BNSF relayed to QTS that Plaintiff had failed a drug test. BNSF's communication that Plaintiff failed a pre-employment drug test took place at approximately the same time that BNSF restricted Plaintiff's access to its property in private

conversations between a limited number of BNSF and QTS personnel.  BNSF never sought to have Plaintiff terminated nor did it direct QTS to terminate him.

Neither BNSF's nor QTS's drug testing policies allow employees to submit a second sample or the results of a second drug test to appeal or challenge a positive test.  Employees of BNSF and QTS who test positive must go through an employee assistance program to be permitted to return to work.  Federal regulations applicable to BNSF require that employees who have failed a drug test be evaluated by a substance abuse professional and complete "prescribed education and/or treatment" before returning to the "performance of safety-sensitive functions."  49 C.F.R. § 40.305.  There is nothing in the record to suggest that the regulations are applicable to QTS; however, as set forth previously, the intermodal agreement between BNSF and QTS gave BNSF the right to restrict any QTS employees from the Cicero facility if BNSF reasonably believed they posed a threat to the safety or security of BNSF's operations.

QTS entered into a service agreement with Bensinger, DuPont and Associates ("BDA") to administer employee referrals to counseling or treatment programs, including drug and alcohol treatment programs.  The agreement between BDA and QTS provides that BDA "will assign an account manager to the Employer.  The account manager will be responsible for contacting Employer's designated representatives, consulting with the Employer on implementation, organization issues and consulting on employee issues and needs * * * and regular assessment of Enhanced Employee Assistance Program effectiveness."  The employee evaluation is performed by BDA.  The evaluation is confidential, and QTS is only told whether the employee participated and successfully completed (or failed to complete) the program.  The record reflects that BDA performs its evaluation without any input from QTS.

QTS offered its employee assistance program to Plaintiff in an effort to have the restriction on his access to BNSF's property removed. Plaintiff attended one employee assistance program meeting.[3] During the meeting, he was informed that unless he admitted to drug use and acknowledged that the results of the positive drug test were accurate, he would be unable to complete the program. Plaintiff refused to state that he had a drug problem or that the Psychemedics' test results were valid and instead left the program.

Jeffrey Monahan, a labor relations consultant to QTS, testified that there were no positions available at any QTS facilities that Plaintiff could transfer to at the time that he was restricted from BNSF's property. See Jeffrey Monahan Dep. at 54:10–55:1. In September 2008, there were QTS locations open in New England, Oakland, two in Houston, Texas, and one in Laredo, Texas. At that time, the nearest non-BNSF QTS facilities to the Cicero yard where Plaintiff had worked were Oakland or New England. The general manager of QTS testified that QTS employees sometimes ask to be relocated to different facilities and, if positions are available, QTS will assist them in their efforts. Plaintiff has not presented evidence that he asked to be relocated to a new facility.

Plaintiff denies that he has used cocaine or any other illegal drugs since 1987. Prior to testing positive for drugs in August 2008, Plaintiff had never failed another drug test during his tenure at QTS. Plaintiff's employment with QTS was terminated on December 31, 2008, upon termination of the Agreement with BNSF. As previously noted, he did not work between September 5, 2008 and December 31, 2008, when he was placed on inactive status at BNSF's request.

---

[3] The record reflects that eight employees of QTS who applied for positions with BNSF failed pre-employment drug tests and were restricted from BNSF's property. Two of those employees went through QTS's employee assistance program, had their restriction on access to BNSF's property lifted, resumed actively working for QTS, and continued working for QTS through the end of 2008 when QTS's contract with BNSF terminated.

## II.     Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III.     Analysis

As previously set forth, BNSF moved to dismiss all claims asserted against it in Plaintiff's first amended complaint.  The Court granted BNSF's motion with respect to Count II (BNSF's liability for negligence by Psychemedics), Count IV (negligence by BNSF), and the tortious interference with contractual relations claim in Count VI, but denied the motion with respect to Plaintiff's claims against BNSF for defamation (Count V) and tortious interference with a prospective business interest (also part of Count VI).  Plaintiff also has asserted claims against QTS for violation of due process pursuant to 42 U.S.C. § 1983 (Count I), liability for the negligence of Psychemedics (Count II), negligence by QTS (Count III); and intentional or reckless infliction of emotional distress (Count VII).[4]  The Court will address each claim in turn.

#### A.     Violation of Due Process under § 1983

Plaintiff alleges that QTS violated § 1983 by denying him pre-termination due process. Pursuant to 42 U.S.C. § 1983, an individual can bring an action for damages for violations of the individual's constitutional rights.  *Id.*  For a § 1983 claim, a plaintiff must establish "'that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law.'"  *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000)); see also *Blum v. Yaretsky*, 457 U.S. 991, 1002-03 (1982) (stating that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful") (internal quotations omitted).  When a plaintiff brings a § 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private person or entity acted under the color of state law.  42 U.S.C. § 1983; see also *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir.

---

[4]   Defendant Psychemedics has not moved for summary judgment.

2007).  The requirement "sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law."  See *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349-51 (1974).  Both the Supreme Court and lower federal courts have acknowledged the difficulty of determining whether a private entity has acted under the color of state law.  See *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 823 (7th Cir. 2009).  At its most basic level, the state action doctrine requires that a court find such a "close nexus between the State and the challenged action" such that the challenged action "may be fairly treated as that of the State itself," *Jackson*, 419 U.S. at 351, or may be "fairly attributable to the State."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

In *Blum v. Yaretsky*, 457 U.S. 991 (1982), the Supreme Court held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Id.* at 1004.  The Supreme Court has set forth several tests for courts to employ in evaluating the "range of circumstances" that might constitute state action. *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001).  According to the Seventh Circuit, the various tests can be categorized as (1) the symbiotic relationship test (satisfied when private and public actors carry out a public function); (2) the state command and encouragement test (satisfied when the state requires the actions of the private actor); (3) the joint participation doctrine (satisfied when the private action is the same as the state action); and (4) the public function test (satisfied when private activity is fairly attributable to the state)). *Rodriguez*, 577 F.3d at 823.

Despite the nominal existence of these tests, the Seventh Circuit has made clear that its (and the Supreme Court's) precedents have "revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 816 (7th Cir. 2009) (citing *Brentwood*, 531 U.S. at 295; *Tarpley v. Keistler*, 188 F.3d 788, 792 (7th Cir. 1999) ("All of the tests, despite their different names, operate in the same fashion: [ ] by sifting through the facts and weighing circumstances.")).   In *Hallinan*, the Seventh Circuit collected examples of circumstances where action by a private party is properly attributed to the state:

> Private action can become state action when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights, *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980); where the state compels the discriminatory action, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); when the state controls a nominally private entity, *Pa. v. Bd. of Dirs. of City Trusts*, 353 U.S. 230, 231 (1957); when it is entwined with its management or control, *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966); when the state delegates a public function to a private entity, *Terry v. Adams*, 345 U.S. 461, 484 (1953); *West v. Atkins*, 487 U.S. 42, 56-57 (1988); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628 (1991), or when there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

*Hallinan*, 570 F.3d at 815-16.

The thrust of Plaintiff's response to QTS's summary judgment motion can be summed up as follows:   QTS is a state actor because the Federal Railroad Administration ("FRA") has promulgated regulations requiring drug testing of certain railroad employees and, because of these regulations, QTS and the government are "willful, joint participants" with respect to drug testing.  Plaintiff's argument fails for several reasons.

First, Plaintiff has not put forth any evidence that QTS's operations at the Cicero facility were directed or controlled by a government entity.  There is no evidence that QTS entered into a

contract with a government entity or that QTS was acting pursuant to government coercion or control. Furthermore, QTS did not send Plaintiff for the challenged drug test, administer the drug test, or retain the company that administered the drug test. All QTS did was honor its agreement with BNSF to bar Plaintiff from working at the Cicero facility until he successfully completed an employee assistance program.

Second, even the most cursory review of the case law reveals that a private entity does not act under color of state law merely by virtue of participating in a highly regulated activity or by complying with state or federal regulations. See *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50; *Jackson v. Metro. Edison Co.*, 419 U.S. at 358-59 ("heavily regulated, privately owned" electric company not a state actor for purposes of Fourteenth Amendment); see also *Rendell-Baker*, 457 U.S. at 841 (quoting *Jackson*, 419 U.S. at 350) ("state regulation, even if 'extensive and detailed,' d[oes] not make a utility's actions state action")); *Holzgrafe v. Hinsdale Bank & Trust Co.*, 2009 Wl 3824651, at *2 (N.D. Ill. Nov. 13, 2009) (holding that "a private commercial entity does not act under color of state law just by dint of being subject to state or federal regulations, even when those regulations are extensive"); *Evans v. Torres*, 1996 WL 5319, at *5 (N.D. Ill. Jan. 4, 1996) (stating that "individuals do not become state actors merely by acting in accordance with state statutes"). Plaintiff has not presented any evidence that the government encouraged, controlled, managed, or directed QTS's activities in any way. Nor has Plaintiff presented evidence that QTS is a railroad and subject to the FRA regulations cited by Plaintiff. Rather, the Federal Railroad Safety Act of 1970 ("FRSA") defines "railroad carrier" as "person providing railroad transportation." 49 U.S.C. § 20102(3). "Railroad transportation" is defined as "any form of nonhighway ground transportation that runs on rails or electromagnetic guideways." 49 U.S.C. § 20102(2). QTS provides lift services to railroads in intermodal yards, and does not own

or operate trains. Plaintiff has not presented any evidence to show that QTS fits within the definition of "railroad carrier" or that QTS provides "railroad transportation."

Plaintiff also claims that QTS acted under color of state law by virtue of performing a public function. It is true that if the state delegates a traditionally exclusive public function to a private party, the private party can be considered a state actor for § 1983 purposes. See *West v. Atkins*, 487 U.S. 42, 55-56 (1988). However, "the relevant question is not simply whether a private group is serving a 'public function.'" *Rendell-Baker*, 457 U.S. at 842. Rather, "the question is whether the function performed has been traditionally the *exclusive* prerogative of the State." *Id.* (internal quotation marks omitted) (emphasis in original). Plaintiff maintains, without citation to relevant evidence or legal support, that intermodal operations of the kind performed by QTS constitute a public function. Plaintiff's argument falters on the complete absence in the record of any evidence that QTS has been delegated a function that has been the *exclusive* prerogative of the State. *Rendell-Baker*, 457 U.S. at 842.

Plaintiff bears the burden of establishing that QTS is amenable to suit under § 1983. For the reasons explained above, Plaintiff has failed to make a sufficient evidentiary showing on this aspect of his claim. See *Lewis v. Crossroads Medical Connections*, 2009 WL 1884377, at *2 (N.D. Ind. June 26, 2009) ("Assuming that everything plaintiff Lewis says in her complaint is true * * * it is clear that she has been treated harshly and unfairly. That does not mean she has suffered a violation of her rights for which a legal remedy exists in federal court."). Furthermore, Plaintiff has failed to present a single case that even arguably supports his position.[5] Instead, he simply relies on mere allegations that QTS somehow is a state actor. Mere allegations do not suffice at summary judgment. Therefore, Plaintiff's § 1983 claim fails.

---

[5]  In support of his statement that "Defendant QTS and the government were thus willful, joint participants, or so intertwined in the drug testing requirements such that the State effectively directed or

## B.     Negligence

### 1.     QTS's Liability for the Alleged Negligence of Psychemedics

In Count II of the first amended complaint, Plaintiff seeks to hold QTS liable for the negligence of Psychemedics.[6]  While nominally a negligence claim against Psychemedics based on its alleged failure to properly and accurately perform and report the results of Plaintiff's drug test, Count II also seeks to hold QTS liable for Psychemedics' alleged negligence.

Plaintiff alleges that Psychemedics is an expert in the field of drug testing and, as such, owes a "duty to properly and accurately perform and report the results of its drug tests."  Cmplt. ¶ 59.  Illinois case law recognizes that a "drug-testing laboratory owes a duty of reasonable care to persons whose specimens it tests for employers or prospective employers."  *Stinson v. Physicians Immediate Care, Ltd.*, 646 N.E.2d 930, 934 (Ill. App. 2d Dist. 1995); see also *Palonis v. Jewel Food Stores, Inc.*, 383 F. Supp. 2d 1072, 1074 (N.D. Ill. 2005).  However, the question remains whether QFS can be held vicariously liable for Psychemedics' alleged negligence.[7]  Plaintiff argues that QTS is liable for the alleged negligence of Pyschemedics due to QTS's "adoption and implementation" of Psychemedic's test results.

Illinois law provides that the negligence of one person will be imputed to another only where a master/servant, principal/agent or employer/employee relationship exists.  See *Moy v. County of Cook*, 640 N.E.2d 926, 928 (Ill. 1994) ("[T]o impute the negligence of one person to

---

controlled Defendant QTS' actions," Plaintiff cites only to *Hu v. Am. Bar Ass'n*, 568 F. Supp. 2d 959, 963 (N.D. Ill. 2008).  In *Hu*, the district court granted motions to dismiss by both defendants and dismissed the plaintiffs' claims with prejudice, finding that the plaintiff failed to even allege that either defendant acted under color of state.  Nothing in *Hu* remotely supports Plaintiff's theory that QTS was acting under color of state law.

[6]  The portion of Count II asserted against BNSF was dismissed for failure to state a claim.

[7]   Of course, this question assumes that Psychemedics was negligent, and, as demonstrated below, Plaintiff has failed to present any evidence that Psychemedics breached its duty of reasonable care to Plaintiff.

another, such persons must stand in a relation of privity and there is no such thing as imputable negligence except in those cases where such a privity as master and servant or principal and agent exists") (quoting *Palmer v. Miller*, 43 N.E.2d 973 (Ill. 1942)); *Alms v. Baum*, 796 N.E.2d 1123, 1129 (Ill. App. Ct. 1st Dist. 2003) (same). If Psychemedics was QTS's agent, QTS "is liable for the acts of [Psychemedics] performed within the scope of the agency." *Gomien v. Wear-Ever Aluminum, Inc.*, 276 N.E.2d 336 (Ill. 1971). By contrast, if Psychemedics is an independent contractor, QTS "will not be held vicariously liable for [Psychemedics'] tortious acts or omissions" unless QTS retained "control over the operative details of [Psychemedics'] work." *Madden v. Paschen*, 2009 WL 3161787, at *14 (Ill. App. Ct. 1st Dist. Sept. 30, 2009); see also *Aguirre v. Turner Const. Co*., 582 F.3d 808, 815 (7th Cir. 2009) (noting that under Illinois law, "no liability will be imposed on the employer or general contractor unless the evidence shows the employer or general contractor retained control over the 'incidental aspects' of the independent contractor's work") (citation omitted).

"The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Tech., Inc.,* 148 F.3d 742, 745 (7th Cir. 1998) (citing cases). Although there is no rigid rule for determining whether an agency or an independent contractor relationship exists, the four major factors to consider are: (1) the right to control the manner in which work is performed; (2) the method of payment and whether taxes are deducted; (3) the level of skill required to perform the work; and (4) furnishing of necessary tools, materials and equipment. *Lang v. Silva,* 715 N.E.2d 708, 716 (Ill. App. Ct. 1st Dist. 1999). The right to control the manner in which work is performed is considered the "hallmark of agency." *Kaporovskiy v. Grecian Delight Foods, Inc.,* 787 N.E.2d

268, 272 (Ill. App. Ct. 1st Dist. 2003). Conversely, an independent contractor undertakes to produce a certain result, but is not controlled in regard to how that result is achieved. *Lang,* 715 N.E.2d at 716. "The existence and scope of an agency relationship are questions of fact." *Tribett v. BNC Mortgage, Inc. et al.*, 2008 WL 162755, at *4 (N.D. Ill. Jan. 17, 2008).

Here, Plaintiff has failed to present any evidence or argument that Psychemedics acted as QTS's agent. There are no facts from which the Court can reasonably infer the existence of such a relationship. In support of his theory that QTS is liable for Psychemedics' alleged negligence, Plaintiff alleges that, under the FRA regulations regarding drug testing of transportation employees, QTS "is responsible for meeting all applicable procedures and requirements of workplace drug testing and is responsible for the actions of its officials, representatives, and agents in carrying out the requirements of the DOT agency regulations." Cmplt. ¶ 63. Plaintiff further alleges that Psychemedics performed the drug test at issue, and that QTS "chose to rely upon and authorize Psychemedics to perform drug tests." *Id.* ¶ 65. Putting aside the fact that Plaintiff has failed to present any evidence on this issue, even the allegations fail to give rise to an inference that QTS exercised any degree of control over the manner in which Psychemedics performed the drug test.[8] Given QTS's lack of involvement with the drug testing done by Psychemedics, these regulations cannot plausibly operate to impose any duties or obligations on QTS with respect to the drug test at issue and certainly do not establish that Psychemedics is QTS's agent for purposes of Illinois tort law. Therefore, summary judgment in favor of QTS is appropriate on Count II. See also *Carroll v. Fed. Exp. Corp.*, 1995 WL 494590 (N.D. Cal. Aug.

---

[8] These same obvious defects in Plaintiff's pleading were noted by the Court in dismissing this same claim against BNSF, yet Plaintiff has chosen to proceed with exactly the same arguments in opposing QTS's summary judgment motion, without offering any evidence to the contrary. QTS's connection to Psychemedics and the drug test is even more tenuous than BNSF's connection, a fact which should have been readily apparent to Plaintiff even at the early stages of this case.

15, 1995) (*aff'd by* 113 F.3d 163 (9th Cir. 1997) (finding that defendant Federal Express was not liable for the actions of the third-party that administered a drug test to a Federal Express employee who was fired following a positive drug test).

2. *Negligence by QTS*

Plaintiff also alleges negligence by QTS based on the federal regulations discussed above. According to Plaintiff, the drug testing regulations promulgated by the FRA impose various duties on employers, including QTS.[9] The Court previously dismissed the same negligence claim with respect to BSNF.

The Court already has determined that federal drug testing regulations do not impose any duties on an employer in this context. See *Cutler v. Quality Terminal Services, Inc.*, 2009 WL 4674124, at *7-8 (N.D. Ill. Dec. 4, 2009). Under Illinois law, the violation of a regulation, ordinance, or statute designed to protect human life or property is *prima facie* evidence of negligence, meaning it is evidence that can be rebutted by proof that the person acted reasonably under the circumstances. See *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 506 (7th Cir. 2009) ("In a common law negligence action, a violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence; the violation does not constitute negligence *per se*.") (quoting *Abbasi ex rel. Abbasi v. Paraskevoulakos,* 718 N.E.2d 181, 185 (Ill. 1999)). In other words, "if a statute defines what is due care in some activity, the violation of the statute * * * presumptively establishes that the violator failed to exercise due care."

---

[9] Specifically, Plaintiff alleges that QTS had a duty under 49 C.F.R. § 219.701 to ensure that the testing standards utilized satisfy the standards prescribed by 49 C.F.R. § 40.1 *et seq.* Plaintiff further alleges that QTS had a duty not to release the results of drug tests to third parties (citing 49 C.F.R. § 40.321), and to notify Plaintiff of his right to test the split specimen and to cancel the results of the drug test when the split sample was not available and the test sample was improperly destroyed (citing 49 C.F.R. §§ 40.153, 40.187(d), 40.201(e)).

*Cuyler v. U.S.*, 362 F.3d 949, 952 (7th Cir. 2004) (citation omitted). Here, Plaintiff contends that 49 C.F.R. § 40.1 *et seq*. defined QTS's duty of care.

As the Seventh Circuit explained in *Cuyler*, "the statutory definition [of the standard of care] does not come into play unless the tort plaintiff establishes that the defendant owes a duty of care to the person he injured * * *, because tort liability depends on the violation of a duty of care to the person injured by the defendant's wrongful conduct." *Id.* (citations omitted). Put differently, the existence of a duty and the breach of a duty are distinct concepts. See *Grant v. South Roxana Dad's Club*, 886 N.E.2d 543, 551 (Ill. App. Ct. 5th Dist. 2008) ("The existence of a duty does not equate to a breach of duty. The two concepts are distinct and must be considered separately."). Consequently, the violation of a regulation is evidence of a breach only if an underlying duty exists. And "the mere fact that a statute *defines* due care does not in and of itself create a duty enforceable by tort law." *Cuyler*, 362 F.3d at 952. See also *Recio v. GR-MHA Corp.*, 851 N.E. 2d 106, 115 (Ill. 2006) ("where a statute or ordinance did not create a private right of action, its violation would only be relevant to whether the defendant 'had acted with less than reasonable care' [but i]t would not have the effect of creating a duty to [the plaintiff] where none existed"); *Ross v. Dae Julie, Inc.*, 793 N.E.2d 68, 75 (Ill. App. Ct. 1st Dist. 2003) ("While alleged violations of codes which do not contain language creating a statutory duty may be evidence of failure to exercise reasonable care, the violations do not create a duty where none otherwise exists. * * * Accordingly, the alleged violations of these safety regulations and standards cannot create a duty.").

Here, Plaintiff's negligence claim is premised on duties that he claims the federal drug testing regulations impose on QTS.[10] However, as the cases above illustrate, those regulations

---

[10] To the extent that Plaintiff bases his negligence claim on a duty found elsewhere—for instance, a duty arising out of the labor agreement between QTS and the union—Plaintiff has failed to present admissible

cannot impose any duties on QTS that did not exist at common law. This Court is aware of no common law duty imposed on employers with respect to drug tests performed by third party laboratories, and Plaintiff has not identified any applicable common law duties. Furthermore, Plaintiff has failed to present any evidence of negligence in the handling of Plaintiff's drug test, beyond his assertion that he has not used drugs in 20 years. The evidence fails to demonstrate that QTS had any involvement with the drug tests, had any duty with respect to the drug tests, or took any action except that required of it under its agreement with BNSF. Because Plaintiff has failed to demonstrate the QTS owed him a duty, QTS's motion for summary judgment is granted as to Count III.

### C.  Intentional or Reckless Infliction of Emotional Distress by QTS

Count VII of Plaintiff's first amended complaint alleges that a claim of intentional or reckless infliction of emotional distress against QTS. Plaintiff maintains that, during the first meeting of the employee assistance program, an agent of QTS told Plaintiff that unless he admitted to having a drug abuse problem and then agreed that the test results were accurate, he would not be allowed to complete the program, that he would never work for QTS again, and that he would not work in the railroad industry. In turn, QTS maintains that it had a preexisting contract with Bensinger, Dupont and Associates ("BDA") to act as its employee assistance program provider. According to QTS, BDA administered the program as an independent contractor and thus QTS cannot be held vicariously liable for its actions.

As this Court previously noted above and in its opinion granting in part Defendant BNSF's motion to dismiss, Illinois courts have held that, "the negligence of one person will be

---

evidence to support this theory. Indeed, Plaintiff's approach to the whole summary judgment process seems to be to revamp the theories originally asserted in his complaint, after those theories were dismissed or at a minimum questioned by the Court in ruling on BSNF's motion to dismiss. Unfortunately for Plaintiff, changing theories during the later stages of a case often leaves a party without the evidence to support the new conclusions. At this stage, allegations are not enough.

imputed to another only where a master/servant, principal/agent, or employer/employee relationship exists." *Phillips v. Quality Terminal Services, LLC*, 2009 WL 4674051 (N.D. Ill. 2009). Under the doctrine of *respondeat superior*, a principal will be held liable for the tort of his agent when the tort is committed within the scope of the agent's agency. *Krickl v. Girl Scouts, Illinois Crossroads Council, Inc.*, 930 N.E.2d 1096, 1100 (Ill. App. Ct. 1st Dist. 2010). However, a principal will not be held liable for the actions of an independent contractor. *Petrovich v. Share Health Plan of Illinois, Inc.*, 719 N.E.2d 756, 765 (Ill. 1999).

The difference is defined by the level of control over the manner of work performance. *Horwitz v. Holabird & Root,* 212 Ill. 2d 1, 287 (2004). An agency is a "consensual relationship in which a principal has the right to control an agent's conduct and an agent has the power to affect a principal's legal relations." *Resolution Trust Corp. v. Hardisty,* 269 Ill. App. 3d 613 (1995). An independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the means and methods of the work, is not under the order or control of the person for whom he does the work. *Horwitz,* 212 Ill. 2d at 13. A court's cardinal consideration in determining whether a person is an agent or an independent contractor, "is the right to control the manner of work performance, regardless of whether that right was actually exercised." *Commerce Bank v. Youth Services of Mid–Illinois, Inc.,* 333 Ill. App. 3d 150, 266 (2002). Another factor of importance is the nature of work performed in relation to the general business of the employer. *Ware v. Industrial Comm'n,* 318 Ill. App. 3d 1117 (2000). Other factors to consider are: (1) the right to discharge; (2) the method of payment; (3) the provision of necessary tools, materials, and equipment; (4) whether taxes are deducted from the payment; and (5) the level of skill required. *Commerce Bank,* 333 Ill. App. 3d at 153.

No single factor is determinative, and the significance of each may change depending on the work involved. *Roberson v. Industrial Comm'n,* 225 Ill. 2d 159, 175 (Ill. 2007). The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal. *Adames v. Sheahan,* 233 Ill.2d 276, 299 (Ill. 2009). Although the existence of an agency relationship usually is a question of fact, it is an issue of law where the facts relating to the relationship are undisputed or no liability exists as a matter of law. *Krickl*, 402 Ill. App. 3d at 5.

Kimberly MacMillan, the Vice President of Human Resources for the Broe Group (which owns Omnitrax and its affiliated companies, including QTS), testified that QTS entered into a service agreement with BDA to administer the employee referrals to counseling or treatment programs. Ms. MacMillan subsequently learned that Plaintiff was one of eight individuals from the Cicero facility who tested positive on the BNSF drug test. Plaintiff was notified by QTS to contact Carla Konece for coordination of referrals to the employee assistance program. All employees of QTS who entered an employee assistance program in 2008 were referred to BDA. Defendant has presented evidence that the evaluations conducted by BDA were confidential and were performed without any input from QTS. QTS and Omnitrax were notified only that an employee was participating successfully or had successfully completed the program. According to Defendant, QTS did not direct BDA as to how to perform the referral services nor did they direct the manner in which the evaluations were conducted. In turn, Plaintiff has not presented evidence (by way of his statement of facts, as he is required to do) that he complained to QTS after he attended the employee assistance program or sought to change the manner in which the program was run; rather, the record reflects only that Plaintiff attended one meeting, refused to comply with the stated requirements, and never went back.

Plaintiff has failed to present sufficient evidence that QTS exerted control over the manner in which BDA conducted the treatment programs.[11]  While QTS and BDA agreed to work together to implement the program and assess its effectiveness, there is no evidence in the record to show that QTS told BDA how to run its meetings or assess the individuals attending the meetings or how to evaluate the individuals.  Instead, the record reflects that the evaluations conducted by BDA were confidential and were performed without any input from QTS.  Furthermore, Plaintiff has not presented any evidence that, after the meeting, Plaintiff complained to QTS or asked QTS to consult with BDA.  Plaintiff simply disagreed with the meeting protocol and did not return.  Plaintiff cannot now blame QTS, particularly where Plaintiff failed to present evidence at summary judgment that QTS had any control over how BDA conducted the program or that he complained to QTS about BDA.

Furthermore, Plaintiff's claim in Count VII is for *intentional infliction of emotional distress*, not breach of contract or negligence as hinted at throughout his brief.  To establish an IIED claim under Illinois law, a plaintiff must prove that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to cause or was aware of a high

---

[11]   In his memorandum in support of summary judgment, Plaintiff refers to and cites the labor agreement between QTS and Local 705.  None of the references to the labor agreement are found in Plaintiff's Local Rule 56.1 Statement of Material Facts in Opposition to QTS's Motion for Summary Judgment as to Count VII.  See Docket Entry 159.  The Seventh Circuit repeatedly has held that a district court is within its discretion to strictly enforce compliance with its local rules regarding summary judgment motions and the Court will do so here.  See *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 359 (7th Cir. 2009); *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000).  Merely including facts in a responsive memorandum is insufficient to put the issue before the Court.  *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000).  As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts.  Judges are not "like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991).  It simply is not the court's job to sift through the record to find evidence to support a party's claim.  *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006).  Adherence to Local Rule 56.1 gives the opposing party the opportunity to either admit or deny the statement of fact, and to provide record support for either assertion.  By not following the rule, a party injects facts into the case that have not been subject to the opposing side's scrutiny, nor presented to the court for its review.  The Court will not accept facts referenced in Plaintiff's memorandum that are not set forth in his statement of facts.

probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct did in fact cause such distress. *Breneisen v. Motorola, Inc.,* 512 F.3d 972, 983 (7th Cir.2007) (citing *Feltmeier v. Feltmeier,* 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 80 (Ill.2003)). With respect to the first element, the allegedly extreme and outrageous conduct was that QTS, in honoring its operating agreement with BNSF, restricted Plaintiff's access to the Cicero facility and required Plaintiff to go to an employee assistance program before he could return to work. No reasonable jury could conclude that this conduct was so extreme and outrageous as to go beyond the bounds of decency. See, *e.g., Kolegas v. Heftel Broadcasting Corp.,* 607 N.E.2d 201 (1992) (noting that the "conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.").[12] Furthermore, there is no evidence that Defendant intended to cause Plaintiff severe emotional distress; rather, the evidence suggests that QTS was providing Plaintiff with the only avenue it could to get Plaintiff back on the job. For these reasons, summary judgment in favor of QTS is appropriate on Plaintiff's intentional infliction of emotional distress claim.

### D. Defamation against BNSF

In Count V, Plaintiff brings a defamation claim against BNSF. To state a claim for defamation under Illinois law, a plaintiff must allege that the defendant made a false statement about the plaintiff, that there was an unprivileged publication of the statement to a third party,

---

[12]   Plaintiff cites extensively to *Fouty v. Ohio Department of Youth Services*, 167 Ohio App. 3d 508 (2006), for the proposition that "QTS failed to perform its obligations with care, skill, reasonable expedience, and faithfulness when it accepted without question BDA's determination that the plaintiff was not in compliance with the EAP." The *Fouty* decision, which does not even mention intentional infliction of emotional distress, does not support the relief requested by Plaintiff in Count VII, nor has Plaintiff presented the evidence (by way of his statement of facts) necessary to support a breach of contract claim, or, as discussed previously, a negligence claim. *Cf. Fouty*, 167 Ohio App. 3d at 510 (finding breach of duty where the employee, who had never tested positive for drugs, was referred to an employee assistance program and before he could get the matter cleared, the administrator sent a letter to the employer indicating the employee had not participated).

and that the publication damaged the plaintiff. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006). Here, Plaintiff alleges that BNSF made a false statement to a third party when it informed QTS that Plaintiff had failed the pre-employment drug test. Plaintiff also alleges that he suffered damages because he lost his job as a result of the communication.

### 1. *False statements*

BNSF maintains that Plaintiff cannot establish the false statement element of a defamation claim because Plaintiff did in fact fail the drug test, such that any statement to that effect was not false. "[T]rue statements cannot support a claim for defamation" because "[t]ruth is an absolute defense to defamation." *Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 1st Dist. 2008). A defendant needs only to show the "substantial truth" of the alleged statement to establish this defense. *J. Maki Const. Co. v. Chicago Regional Council of Carpenters*, 882 N.E.2d 1173 (Ill. App. Ct. 2d Dist. 2008). Substantial truth is demonstrated when the defendant has shown that the "gist" or "sting" of the alleged defamatory statement is true. *Id.*

Initially, the Court notes that Plaintiff has not suggested that the results reported by Psychemedics indicate anything other than that Plaintiff had tested positive for certain substances. Thus, to the extent that they accurately reflect what they appear to show—the presence of certain substances in Plaintiff's hair—then any statement concerning the results would appear to be true. Put another way, assume that the facts are identical to those presented in this case, except that Plaintiff tested negative for drug use and Psychemedics reported that the test results were positive (when in fact the result indicated a negative test). The statement that the test was positive would have been false. Here, the only evidence presented is that the result of the test was positive and the only allegedly false communication was that Plaintiff failed a

drug test.  Even if the Psychemedics analysis was in error, any statement that Plaintiff failed a drug test would still be true.  The statement was not "John Culter used drugs."  If it had been, then Plaintiff's testimony that he had not used drugs in 20 years would create an issue of disputed fact.  Rather, the allegedly false statement was that Plaintiff tested positively for drug use.  And in fact, the only evidence in the record is that the result of the test was positive.  See also *Caputo v. Compuchem Laboratories, Inc.*, 1994 WL 100084, at *4 (E.D. Pa. Feb. 13, 1994) (finding "no justification in the factual record or in the law for plaintiff's position that liability for either negligence or defamation can or should be imposed upon the defendant for accurately reporting a 'lab positive' drug test without assuring that it was a 'verified positive' result" or for failing to take further steps to confirm the accuracy of the test).

The only way that that such a statement might qualify as defamation is if the results reported by Psychemedics were incorrect.[13]  That is, the statement must have been false when Psychemedics reported it.  In support of his claim that the drug test result was incorrect, Plaintiff put forth the result of the drug test that he had performed on a hair sample taken a month and ten days after his hair sample was taken for BNSF's drug test. But Plaintiff has not presented any evidence that a subsequent negative drug test, especially one performed on a hair sample taken significantly later, in any way indicates that a prior positive test was incorrect. Put differently, Plaintiff has put forth no evidence that the passage of time would not affect the outcome. Plaintiff therefore cannot rely on a subsequent test to refute the "substantial truth" of statements related to the original drug test any more than he could rely on tests taken today.  In fact, it is undisputed that the results of a later drug test on a different hair sample do not necessarily indicate that the results of a prior test are incorrect.  Variables affecting whether a drug shows up

---

[13]  The Court has not found a case which supports this theory, but in the interest of addressing Plaintiff's arguments, the Court briefly considers it.

on a subsequent test include time between tests, ingestion history, quantity used, frequency of use, potency of drug, body weight, and metabolism. Thus, a subsequent result cannot determine the validity, accuracy, or truth of a prior test. There simply is no way to know that the drug has not cleared by the time of the second test.

To prove the results were erroneous, Plaintiff would have to show a failure in the testing procedure or negligence between when the sample was taken and when BNSF got the results. Yet Plaintiff has chosen not to depose any individuals from Examination Management Services, Inc. ("EMSI"), the independent contractor hired by BNSF to take the hair samples. There is no evidence in the record that EMSI committed any negligence in handling the hair samples. Instead, both Psychemedics and Dr. Thomasino reviewed the chains of custody and tamper evident seals, initialed by Plaintiff, and found them intact. In addition, even if there had been contamination somewhere between when EMSI took the hair sample and when Psychemedics tested it, which there is no evidence of, the record reflects that Psychemedics extensively washed the hair to decontaminate it before performing a second test to confirm the initial findings. Similarly, Plaintiff has chosen not to depose any individuals from Psychemedics, which conducted the drug tests. In performing the tests, the record reflects that Psychemedics followed standard practices, procedures, and tests cleared by the US Food & Drug Administration. Psychemedics verified, confirmed, checked, and retested Plaintiff's drug test and screening results before reporting them to BNSF's medical review officer, Dr. Thomasino. Psychemedics performs a retest on all positive drug screens to ensure the results are correct, as it did in this case. The last step in the process was review by Dr. Thomasino. As with EMSI and Psychemedics, there also is no evidence of negligence by the doctor. The record reflects that he followed proper medical review procedures in confirming the test results. There simply is no

evidence that EMSI, Psychemedics, or Dr. Thomasino committed any negligence in performing the drug tests or that the sample was "contaminated, switched, or procured through error." See Pl.'s Resp. at 6.

Plaintiff cites *Wigginton v. White*, 364 Ill. App. 3d 900 (1st Dist. 2006), for his claim that a jury could find the test results to be false, but *Wigginton* is inapposite for several reasons. First, the case involved federally regulated urine drug testing. *Id*. at 907. The Department of Transportation prescribes specific procedures that must be followed when the drug testing is covered by federal regulations. But the pre-employment drug testing performed on Plaintiff was not federally regulated, so there is no set procedure to be followed. Second, in *Wigginton* it was clear from the evidence presented at every step in the plaintiff's appeal process that certain federal regulations governing the drug testing procedure had been violated. *Id*. at 903–04. The medical review officer had failed to inform the plaintiff that she was entitled by regulation to a split sample retest, if she requested one, and a hearing officer concluded that "federal procedures governing drug testing were likely not followed in that it appeared that 'the original sample was not a split sample.'" *Id*. at 903-04. Thus, there were specific regulatory violations at the center of the plaintiff's claim that the drug test results were unreliable. But here, Plaintiff has no evidence to suggest that there were any violations of any procedures or any other forms of negligence in the testing process employed by BNSF.

Furthermore, *Wigginton* involved an administrative agency hearing and judicial review of the resulting decision, and the opinion does not even mention the tort of defamation. There are significant differences between an administrative hearing officer's adjudication of a dispute and a federal court's adjudication of the same. The issues addressed by the *Wigginton* court were whether the burden shifted after the plaintiff made out a prima facie case and whether the

plaintiff had presented sufficient evidence at the administrative hearing to meet her burden. *Id*. at 905–910. Whether the plaintiff in *Wigginton* presented sufficient evidence to state a prima facie case challenging a decision made by the Illinois Secretary of State under 625 ILCS 5/6-106.1(g)(5) has limited application here. At play are different burdens in different legal situations involving different adjudicating bodies. Finally, the *Wigginton* defendant presented no evidence at all that the drug test results were reliable, while the plaintiff presented significant evidence that they were not. *Id.* at 910–11. Here, the opposite is true.

Plaintiff essentially makes due process arguments to support his claim of defamation. He argues that he was entitled to split sample retests, which BNSF unreasonably denied him. But whether he was defamed does not turn on whether BNSF afforded him an opportunity to clear his name. It turns, among other things, on whether the statements made by BNSF were false. Furthermore, neither BNSF nor QTS provided for split sample retests. Plaintiff may not like this policy, but he has not stated a claim or presented any evidence to suggest that the policy violated a law.[14] Plaintiff has failed to raise a genuine issue of material fact on the question of whether any communication of the drug test results was false, and thus Plaintiff has failed to establish the first element of defamation.

### 2. *Qualified privilege*

Even if Plaintiff had produced sufficient evidence to prove the other elements of defamation, Defendant maintains that the alleged communication by BNSF to QTS of the fact that Plaintiff failed a drug test would be entitled to a qualified privilege. As a preliminary

---

[14]     In its review of the case law, the Court has found cases in which plaintiffs challenged collective bargaining agreements for the failure to provide for split sample tests or an avenue for challenging an allegedly false positive drug test. See, *e.g.*, *Williams v. Hitachi Zosen Clearing, Inc*., 1987 WL 14095 (N.D. Ill. Sept. 24, 1987) (finding that plaintiff's defamation claim based upon dissemination of drug test results among management was part of the discharge process, which is governed by the collective bargaining agreement); *Estes v. Beta Steel Corp*., 2006 WL 3542731, at *6 (N.D. Ind. 2006) (same). However, the Court has not found any cases supporting Plaintiff's defamation theory in this case.

matter, although BNSF asserts a qualified privilege in its motion, it never asserted qualified privilege as an affirmative defense to the defamation claim against it in its answer. In Illinois, "[a] qualified privilege is an affirmative defense to defamation." *Babb v. Minder*, 806 F.2d 749, 753 (7th Cir. 1986). However, "when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal." *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir. 1987). "Where the matter is raised in the trial court in a manner that does not result in unfair surprise * * * technical failure to comply precisely with Rule 8(c) is not fatal * * * * That is, the defendant does not waive an affirmative defense if [h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." *Lucas v. United States*, 807 F.2d 414, 417-18 (5th Cir. 1986) (quotations and citations omitted); see also *Abbadessa v. Moore Bus. Forms, Inc.*, 1992 WL 471273, *2 (D.N.H. Jan. 7, 1992) (affirmed by 987 F.2d 18 (1st Cir. 1993)) (concluding that in the absence of prejudice to the opposing party, courts may allow affirmative defenses to be raised for the first time in a post-answer motion for summary judgment). All of the elements of the qualified privilege BNSF now asserts have been at issue throughout the litigation and have been the subject of extensive discovery by all parties. Particularly, the motivation, extent, timing, and recipients of BNSF's alleged communication have been the subject of discovery. See *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 727 (7th Cir. 2004). None of these issues are new, nor can Plaintiff be surprised by the argument that BNSF relayed the information to QTS because, under the terms of the agreement, BNSF had a right to restrict Plaintiff from the property following a positive drug test. Furthermore, Plaintiff has asserted theories in his responses to the summary judgment motions that differ substantially from the theories set forth in his complaint. The Court

has considered those new theories and likewise will also consider whether BNSF is entitled to a qualified privilege in its communication with QTS.

"An otherwise defamatory statement is not actionable if made under a qualified privilege." *Haywood v. Lucent Technologies, Inc.*, 169 F. Supp. 2d 890, 916 (N.D. Ill. 2001) (affirmed by 323 F.3d 524 (7th Cir. 2003)). "The existence of qualified privilege is a question of law." *Id.* "Illinois law confers a privilege upon '[s]tatements made within a legitimate business context.'" *Republic Tobacco*, 381 F.3d at 727. Under this rule, "[a] statement is conditionally privileged when the defendant makes it (1) in good faith; (2) with an interest or duty to be upheld; (3) limited in scope to that purpose; (4) on a proper occasion; and (5) published in a proper manner only to proper parties." *Republic Tobacco*, 381 F.3d at 727 (citing *Zeinfeld v. Hayes Freight Lines, Inc.*, 243 N.E.2d 217, 221 (Ill. 1968). A court must "weigh the value of the type of interest to be protected against the degree of damage to be expected from release of the type of defamatory matter involved." *Haywood*, 169 F. Supp. 2d at 916–17. If a qualified privilege is established, the communication becomes actionable only if the privilege was abused. *Id.* at 917. "To satisfy this burden, the plaintiff must present evidence of a 'reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.'" *Id.*

The record reflects that BNSF's communication that Plaintiff failed a pre-employment drug test took place at approximately the same time as BNSF restricted Plaintiff's access to its property in private conversations between a limited number of BNSF and QTS personnel. BNSF never sought to have Plaintiff terminated nor did it direct QTS to terminate him. BNSF has a right under its agreement with QTS to bar employees who tested positive for drugs from its

premises. There was a clear interest on BNSF's part to restrict employees who tested positive for drugs from its property. BNSF believes, and Plaintiff does not dispute, that an individual working on the premises of one of BNSF's intermodal facilities who tests positive for illegal drugs poses a threat to the safety of BNSF's operations. BNSF's willingness to permit the restricted employees to go through QTS's employee assistance program to regain access to BNSF's property suggests that its actions were in good faith. The terms of the agreement gave BNSF a right to restrict Plaintiff from the property, but BNSF and QTS also provided Plaintiff with an avenue to have the restriction lifted.

On or around August 28, 2008, Steven Klug, the Vice-President of Human Resources of BNSF, sent an e-mail to Michael Burke (and copied five other BNSF co-workers on the e-mail), asking BNSF to limit its communication with QTS regarding the eight employees to the fact that these eight employees were only restricted from the Cicero yard as a result of information obtained from them in accordance with their employment applications to BNSF and not include the reason for this restriction, namely the positive drug test results. The inference that can be drawn from the email is that BNSF previously communicated the test results to QTS and then determined that the proper course, going forward, was to communicate only that they were restricted from the yard as a result of information obtained from them in accordance with their employment applications to BNSF and not include the reason for this restriction, namely the positive drug test results. This e-mail does not evince malice—the interpretation urged by Plaintiff—but rather an effort to curb the release of information to only what was necessary. There simply is not sufficient evidence that any communication of the fact that Plaintiff failed a drug test was made by BNSF with malice.

Additionally, the undisputed facts demonstrate that the communication was limited in scope in that QTS was never informed of the specific drug for which Plaintiff tested positive nor was it informed of any other details. QTS's knowledge of Plaintiff's test result was limited to the fact that he had failed a drug test. This was sufficient information, and no more than required, to satisfy QTS's interests. Additionally, communication would have been made on "a proper occasion." At the same time that Plaintiff alleges that BNSF made the communication, BNSF was restricting Plaintiff's access to its property pursuant to the terms of its operating agreement with QTS. The information was relevant at the point at which Plaintiff claims it was revealed. Finally, there is no evidence to suggest that BNSF's alleged publication extended to other entities or involved inappropriate methods. Thus, publication was "in a proper manner only to proper parties."

Finally, the Court may "weigh the value of the type of interest to be protected against the degree of damage to be expected from release of the type of defamatory matter involved." *Haywood*, 169 F. Supp. 2d at 916–17. Here, BNSF had an interest (and a right under the terms of the operating agreement) in restricting the access of employees who tested positively for drugs. BNSF also provided employees with an avenue for getting back to work. On the other hand, the damage to Plaintiff was great, as he never returned to work for QTS because he did not complete the employee assistance program and suffered distress and embarrassment from losing his job. Although these particular circumstances are unfortunate, the Court cannot conclude that the damage to Plaintiff outweighed BNSF's interest in relaying the information. At best, it is a wash, given the public safety concerns inherent in BNSF's business operations.

Plaintiff has failed to show that BNSF committed a "reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter,

limit the scope of the material, or send the material to only the proper parties." *Haywood*, 169 F. Supp. 2d at 917. As discussed above, Plaintiff has failed to produce sufficient evidence to suggest that BNSF should have been wary of the test results. There is no evidence of negligence by EMSI, Psychemedics, or Dr. Thomasino. All of them followed standard procedures. Subsequent negative results do not raise a sufficient challenge to prior positive results, especially when based on samples taken a month and ten days apart. Thus, BNSF reasonably relied on the results. While the evidence demonstrates that BNSF alerted only the proper parties, there is a question of whether the evidence could have been limited as suggested by Klug's e-mail, or whether it was necessary to convey that Plaintiff failed a drug test. But even if it would have been more appropriate to limit the information as set forth in the e-mail, the Court cannot conclude (i) that it was reckless to state that Plaintiff had failed a drug test or (ii) that BNSF acted with any malice in doing so. Thus, even if Plaintiff had been able to demonstrate that the statement was false, BNSF did not abuse the qualified privilege, and the alleged statement is not actionable.

### E. Tortious Interference with a Prospective Economic Interest by BNSF

Count VI alleges tortious interference with contractual relations against BNSF. In ruling on BNSF's motion to dismiss, the Court concluded that Plaintiff stated a claim for tortious interference with a prospective economic advantage but failed to state a contractual relations claim. See, *e.g.*, *Canel and Hale, Ltd. v. Tobin*, 710 N.E.2d 861, 871 (Ill. App. Ct. 1st Dist. 1999) (under Illinois law, "[a]n action for tortious interference with contractual relations is not the proper vehicle for a discharged [at-will employee] seeking to recover damages;" rather, an action for tortious interference with a contract that is terminable at will is classified as one for intentional interference with prospective economic advantage); *Storm & Associates, Ltd. v.*

*Cuculich*, 700 N.E.2d 202, 210 (Ill. App. 1st Dist. 1998). Thus, on summary judgment, the Court addresses only whether Plaintiff has put forth sufficient evidence to show a triable issue over whether BNSF tortiously interfered with a prospective economic advantage.

The elements of such a claim are: "'(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Evans v. City of Chicago,* 434 F.3d 916, 929 (7th Cir. 2006) (quoting *Anderson v. Vanden Dorpel,* 667 N.E.2d 1296, 1299 (1996)). With respect to the third element, "a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but * * * [that] the defendant has committed some impropriety in doing so." *Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 768 (Ill. App. Ct. 1st Dist. 2004).

Here, Plaintiff demonstrated that he had an existing employment relationship with QTS and a reasonable expectation of continued employment. The record also reflects that BNSF was aware of the employment relationship and that BNSF prohibited Plaintiff from entering the Cicero facility despite knowing that doing so would cause Plaintiff to be on inactive status. However, the facts found in the record do not give rise to liability.

To begin, Plaintiff has conceded that BNSF had a right to restrict Plaintiff's access to its property. See Pl.'s Resp. to BNSF's SOF ¶ 38 (uncontested). Thus, Plaintiff must show that BNSF committed some "impropriety" by restricting his access. *Dowd*, 816 N.E.2d at 768. But rather than showing impropriety, BNSF appears to have acted consistent with its agreement with QTS. The positive test result, which was reviewed by BNSF's medical review officer, justified BNSF's actions. Furthermore, Plaintiff was in a position to regain access to BNSF's property if

he completed QTS's employee assistance program. If anything, BNSF's willingness to allow two other employees to regain access to the property after successfully completing the program demonstrates good faith on the part of the employer, not impropriety.

Plaintiff argues that his claim of tortious interference can be sustained by the communication of the test results to QTS—in other words, it was improper to tell QTS that Plaintiff had failed a drug test. In support of his argument, Plaintiff presents many of the same arguments he presented in favor of his defamation claim. And as it did in responding to the defamation claim, BNSF maintains that, to the extent that BNSF's actions in restricting Plaintiff's access can be deemed tortious interference, its action were privileged. "Under Illinois law, a qualified privilege protects employers' officers from being sued for tortious interference." *Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 668 (7th Cir. 2007) (citing *Welch v. Ill. Sup.Ct.,* 751 N.E.2d 1187, 1197 (2001)); see also *Ali v. Shaw,* 481 F.3d 942, 945 (7th Cir. 2007) ("In the corporate world, officers enjoy immunity from * * * [tortious interference] claims provided that they took the action in pursuit of the legitimate interests of the company."); *Fellhauer v. City of Geneva,* 568 N.E.2d 870, 877-79 (Ill. 1991) (holding that public employee discharged by official in charge of hiring and firing did not state a claim for tortious interference with economic advantage). The privilege can be abused (and thus lost) if the employer acts maliciously. *Welch,* 751 N.E.2d at 1197. "In the context of a suit for tortious interference with a prospective economic relationship, the term 'malicious' * * * means intentionally and without justification." *Delloma v. Consolidation Coal Co*., 996 F.2d 168, 171 (7th Cir. 1993).

BNSF's actions were taken to ensure its business interest in having a drug free workplace and maintaining the safety and security of its operations, consistent with its agreement with QTS. Both BNSF and QTS have policies that require an employee to go through an employee

assistance program before returning to work if the employee tests positive. Under those policies, employees are not entitled to challenge the positive drug test results with subsequent negative test results. Federal regulations applicable to BNSF also require that employees in safety-sensitive functions who fail a drug test be evaluated by a substance abuse professional and complete "prescribed education and/or treatment" before returning to work. Consequently, it was reasonable for BNSF to restrict Plaintiff's access to its property and require him to complete an employee assistance program, even if it knew that it would lead to the employee's termination if he declined to participate in the program. The evidence simply does not support a finding that BNSF acted without justification or with malice. *Cf. Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1133 (Ill. 2001) (holding that tortious interference claim premised on allegedly inaccurate credit reporting cannot succeed when a mortgage servicer truthfully reports a loan as in foreclosure, even when the underlying events leading to the foreclosure are disputed and the loan is later reinstated); *Hukic v. Aurora Loan Services*, 588 F.3d 420, 433 (7th Cir. 2009). Similarly, for the reasons stated in analyzing Plaintiff's defamation claim, Plaintiff also fails to demonstrate that BNSF acted maliciously.

\* \* \* \*

In sum, accepting Plaintiff's contention that he had not used drugs in 20 years, the events in this case leading to his suspension from work and ultimate dismissal are unfortunate. Furthermore, although it may be true that the increasing use of drug testing for employment purposes raises questions concerning the duties owed by entities seeking and using the tests to current or prospective employees subjected to the tests, the fact that there are reasons to be concerned about the uses, potential misuses, or abuses of drug test results does not justify imposing additional and unprecedented duties upon Defendants in this case, particularly when

there is no evidence of any negligence surrounding the test at issue. Perhaps it is an issue to be addressed in agreements between employers and unions, but on the facts presented by this record and pursuant to the claims brought by Plaintiff, there simply is no liability on the part of Defendants in these circumstances.

**IV.    Conclusion**

For these reasons, the Court grants BNSF's motion to strike [152] and also grants the summary judgment motions [127, 132, & 133] filed by BNSF and QTS. No claims remain against Defendants BNSF and QTS. The Court sets this matter for a status conference on March 14, 2012, at 9:00 a.m., to determine which claims, if any, remain pending as to Defendant Psychemedics.

Dated:  February 29, 2012

_____
Robert M. Dow, Jr.
United States District Judge